## STATE OF IOWA;

DES MOINES, JUNE TERM, A. D. 1871.

IN THE TWENTY-SIXTH YEAR OF THE STATE.

PRESENT:

HON. JAMES G. DAY, CHIEF JUSTICE.
 " CHESTER C. COLE, ⎫
 " JOSEPH M. BECK, ⎬ JUDGES.
 " WILLIAM E. MILLER, ⎭

---

## FULLER v. THE CHICAGO & N. W. R. R. Co.

1. Railroad: EFFECT OF STATUTE PENALTY. Act of 1862, section 2, chapter 169, laws of the ninth general assembly, making railroad companies liable to a penalty for violations of its provisions, in failing to fix and post rates of fare and freight, and for overcharging, was not intended to deprive a person from whom overcharges were collected from recovering the amount paid him in excess of the rates

Fuller v. The Chicago & N. W. R. R. Co.

fixed. He may, in an action against the company, recover the amount wrongfully collected and, also, the penalty provided by the act.

2. —— ESTOPPEL. Whether the plaintiff could recover the overcharge if he knew at the time of payment that it was in excess of the rates fixed, *quere*. But if he was ignorant of that fact at the time, he could recover.

3. —— CHARACTER OF INTENT. The word "willfully," as used in said section, does not imply the idea of malice ; and if it be shown that the railroad company designedly omitted to do the things enjoined by the act, it will be sufficient to fix its liability to the penalty prescribed. Whether such omission was by design or through mistake or inadvertence is a question of fact for the jury.

4. —— EVIDENCE : DECLARATIONS. Evidence of the plaintiff's declarations to the drayman who delivered the goods to him, to the effect that he thought the freight charges were too high, was held admissible on the part of plaintiff as showing a fact connected with the payment of the overcharge.

5. —— CONSTITUTIONAL LAW : COMMERCE BETWEEN THE STATES. The aforesaid section is not in conflict with article 1, section 8 of the constitution of the United States, on the ground that it infringes on the right of congress to regulate commerce between the several States. Such acts are in the nature of police regulations indisputably within the legislative power of the State.

*Appeal from Marshall Circuit Court.*

WEDNESDAY, APRIL 5.

ACTION to recover a statute penalty and overcharges paid on merchandise transported upon defendant's railroad. The facts of the case appear in the opinion. There was a verdict and judgment thereon for plaintiff. Defendant appeals.

*Henderson & Merriman* for the appellant.

1. A penal statute in derogation of the common law must be strictly construed, and a party suing for a statute penalty is confined to the remedy provided by the law.

Plaintiff cannot rely for his cause of action upon a stat-

ute which gives him a specific remedy and yet combine with that remedy a totally different and distinct cause of action ; or, more specifically, the plaintiff cannot combine in his action a claim for the penalty under a statute which gives him a penalty *only* for an excessive charge for transportation, and also a claim for the excess.

The statute fixes a penalty *in all cases of willful overcharge*, which, it is evident from the terms of the statute, is to compensate and *fully indemnify* the party injured by the excessive charge, and provides no other remedy.

That this is the correct interpretation of the statute is fully determined, in our opinion, by the maxim, "*Expressio unius, est exclusio alterius.*" *Brown* v. *Buffalo & State Line R. R.*, 22 N. Y. 191.

In the above case the court refer to and approve *Behan* v. *The People*, 17 N. Y. 517, and therein state, "that the legislature, having fixed the penalty at the same time of prohibiting the act, designed there should be no further punishment."

Our statute, prohibiting an overcharge by implication only, merely provides that, in case of a willful overcharge, the penalty shall attach, negativing, by its very terms, any other remedy or cause of action.

An overcharge before the passage of the statute was attended with no other consequences than liability to pay it back, if the party paying it reserved the right by *protest*.

Now that the statute has provided a penalty for the act, the penalty only can be enforced. In *The People* v. *Stevens*, 13 Wend. 341, the court say : "Where a statute creates a new offense by making unlawful that which was lawful before, and prescribes a penalty and mode of proceeding, that penalty can alone be enforced;" and to same effect Lord MANSFIELD in *Rex* v. *Robinson*, 8 Burr, 800 ; 1 Russell on Crimes, 49 ; 1 Chitty's Pl. 118 ; *Martin* v. *Taylor*, 1 Wash. C. C. 1.

Furthermore, no greater hardships should be imposed for

the commission of a prohibited act than the statute prohibiting it will plainly permit. *Schooner Enterprise,* Paine's C. C. 32; *The Industry,* 1 Gallis' C. C. 114.

This action arises out of shipments of goods over a year prior to the commencement of it. The evidence shows that the money was paid voluntarily, without protest or objection. The plaintiff has bound himself by the payment of the entire freight, and is estopped from now denying his voluntary act.

The alleged excessive charges were therefore voluntary payments, and cannot be recovered back. *The N. Y. & H. R. R. Co.* v. *Marsh,* 12 N. Y. 312; *Fleetwood* v. *City of New York,* 2 Sandf. 475; *Lowber* v. *Selden et al.,* 11 How. Pr. 527; *Hall* v. *Shultz,* 4 Johns. 240.

In all of which cases it was held that money paid voluntarily cannot be recovered back, even though its payment could not have been enforced by law.

Money paid, unaccompanied by remonstrance or protest, is a voluntary payment, and cannot be recovered back, whether paid under mistake of law or not. *Elliot* v. *Swartwout,* 10 Pet. 153. And payment in such cases nullifies the claim. 4 Johns. 240; 2 Sandf. 476.

The evidence shows that this money (alleged excessive charges) was, in point of fact, paid voluntarily. The attention of the defendant or any of its authorized agents was not called to the charge, nor is there any evidence showing, or tending to show, that the plaintiff himself considered the charge excessive, so far as the defendant's actual rates were concerned. He does not say he did certainly, and the case of *Elliott* v. *Swartwout,* therefore, applies to this case.

But admitting, for the purposes of argument, that he did know the rates, and that there was an illegal charge under the statute, then he should not have paid the money except under the most solemn protest, of which there is no evidence. The law required that of him, as we have here-

tofore shown. The law was open to him as it was to defendant, and he had no more right to entrap defendant by proceeding contrary to law in making the payment, than defendant had to insist upon full payment where it was shown to be wrong.

We, therefore, insist that it is not in the power of plaintiff to thus take advantage of his own wrong.

We have looked in vain for any case in which the amount paid was allowed to be recovered back, in a case like this, under a similar statute. Some cases may be referred to, as was done in the court below, like that of *Chase* v. *The N. Y. Cent. R. R.*, 26 N. Y. 523, as sustaining the right to recover back, but an examination of that case will show that the statute, in addition to the penalty, expressly provided for recovery of the excess.

Nor are the old English cases, upon the question of excessive charges, authority, the decisions being upon their statute of " *Tolls*," which expressly provided for the recovery of the excess.

The court below, therefore, erred in refusing to instruct the jury, that the claim for money paid as excessive charges could not, in any event, under the evidence, be recovered.

II. The evidence does not authorize a recovery of the penalty.

The plaintiff cannot recover the penalty claimed and provided by the statute, for if his allegations are sufficient to base a right of recovery upon, still the evidence does not sustain the allegations, nor does it tend to sustain them.

To constitute a right of action in favor of the plaintiff, there must be a *willful* disregard of the matters and things, enjoined by the statute, on the part of the defendant.

The failure to post, etc., or the mere receipt of a greater rate of freight or fare than that posted, does not constitute a cause of action, else the term " willfully " would be without meaning.

The term "willful" is defined by the courts, and understood "to extend a little further than *intentionally* or *designedly* and to approximate the idea of the milder kind of *malice*: that is, as signifying an *evil intent without justifiable excuse*." *Chapman* v. *Commonwealth*, 5 War. 427, 429.

Chief Justice SHAW says: "With bad purpose, corruptly." 1 Bish. Crim. Law, § 262.

This evil intent will not be presumed absolute, and plenary proof of the willfulness will be required by the court. *Nelson* v. *Eaton*, 26 N. Y. 405.

Nor will the court *presume* a state of facts, in order to create a forfeiture upon proof of facts, which, without such presumption, would not create the forfeiture; that is, the excessive charge being shown, the willfulness will not therefore be inferred or presumed, it must *also* be shown. 29 Barb. 325; 1 Chitty's Crim. Law, 233; 1 Bish. Crim. Law, § 8, n. 8; id. § 253.

And the courts will require that the plaintiff alleging such intent shall prove it *precisely*. See last above authorities; 3 Peters' Dig. 208, § 21; 1 Bish. Crim. Law, § 227 and cases cited.

III. The power of congress to regulate commerce is exclusive.

The court erred in sustaining plaintiff's demurrer to the answer, and in refusing the instruction asked by defendant, relating to the unconstitutionality of the State law.

1. Section 2, chapter 169, laws of the ninth general assembly of the State of Iowa, so far as the same is applicable to the matters in controversy in this suit, is repugnant to the constitution of the United States and the laws of congress, and null and void.

2. Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes. Art. 1, § 8, Constitution U. S.

3. By act of congress, June 15, 1866, every railroad

company in the United States, whose road is operated by steam, is authorized to carry *passengers, freight* and *property* on their way from *any State to another State*, and to receive *compensation* therefor. 14 U. S. Stat. at Large, 66.

4. The only questions to be considered in determining whether the State law is repugnant to the constitution of the United States, and the laws of congress thereunder, as a regulation of *fare* and *freight* on the transportation of *passengers, freight* and *property* on their way from one State to another, are, first, whether the power to regulate commerce among the several States is exclusively vested in congress; and, second, whether the carrying of such passengers, freight and property from State to State for hire or compensation is commerce; for if it is, it is commerce among the several States. If these two propositions be, as they must, admitted, then it follows that a State cannot in any manner regulate such hire and compensation any more than it can restrict or interdict the carrying of the persons or the goods. The State cannot do indirectly that which it has no power or authority to do directly; nor require the carrier, under heavy penalties, which may be made, and which, as the law now stands, are, a mode of taxation, to regulate what it cannot regulate itself.

The leading case which, beyond all cavil, has forever settled these questions, is that of *Gibbons* v. *Ogden*, reported in 9 Wheat. 196.

5. The power to regulate commerce among the several States is *exclusively* vested in congress, as absolutely so as it would be in a *single* government, and *no part of this power can be exercised by a State*. *Gibbons* v. *Ogden*, 9 Wheat. 196.

6. The power to regulate commerce intended to be granted was the power which *previously* existed in the States, and it is *necessarily exclusive*. *Gibbons* v. *Ogden*, 9 Wheat. 197, *et seq*.

7. The *grant* is *general* and *unlimited in its terms* and

*necessarily excludes* the action of all others. The full power to regulate implies the whole power and leaves no *residuum.* *Gibbons* v. *Ogden,* 9 Wheat. 198; *Brown* v. *Maryland,* 12 id. 446; Story's Com. 1063.

8. Whenever the terms in which a power is granted by the constitution, or whenever the nature of the power itself requires that it shall be exclusively exercised by congress, the *subject is as completely* taken away from State legislation as if they had been forbidden to act. *Sturges* v. *Crowninshield,* 4 Wheat. 193; *Holmes* v. *Jennison,* 14 Pet. 576, 591.

10. The power to regulate commerce is just as exclusive of State legislation as the power to borrow money on the credit of the United States; to establish uniform rules of naturalization; to coin money; to establish post-offices and post-roads; to declare war. *Passenger Cases,* 7 How. 394.

11. The proposition that a State may pass *any* act to *obstruct or regulate* commerce, which does not conflict with any act of congress, would contradict the language of the court in *Gibbons* v. *Ogden, Brown* v. *Maryland,* and every other case in which the commercial power has been considered. *Passenger Cases, supra,* 398.

12. A concurrent power in two distinct sovereignties to regulate the same thing is as inconsistent in principle as it is impracticable in action. It involves a moral and physical impossibility. The action of one necessarily precludes the other, and that which is first, being competent, must establish the rule. *Passenger Cases,* id. 399.

13. A concurrent power in the States to regulate commerce is an anomaly not found in the constitution. *Passenger Cases,* id. 396.

14. No State can regulate foreign commerce, or commerce among the several States, because the power is exclusively vested in congress. *Passenger Cases,* id. 400.

15. That the power to regulate commerce among the

several States is exclusively vested in congress, is as fully established as any other power under the constitution which has been controverted. *Passenger Cases*, id. 408.

16. The intention was to establish among the States a perfect equality in respect to commerce and navigation, and this intention can neither be interrupted by congress nor by the States. When congress enacts regulations of commerce, it does so for the United States, and the equality exists. When a State passes a law *in* any *way* acting upon commerce, it can only do so for itself, and the equality is destroyed. In such case the constitution would be violated, both in the spirit and in the letter. *Passenger Cases*, id. 420.

17. A State cannot interfere in any manner with commerce authorized and regulated by congress, whether it be persons, freight or property, *until the persons are landed*, and the *freight* or *property have become a part of the general mass of property of the State Passenger Cases*, id. 422.

18. The power claimed (not the exercise of the power) by the State is in its nature in conflict with the power given to congress, and the extent to which it may be exercised does not enter into the inquiry concerning its existence. The power is complete in itself, and has no limitations other than are prescribed by the constitution itself, and it is co-extensive with the subject on which it acts. *Brown* v. *Maryland*, 12 Wheat. 446, 447; *Gibbons* v. *Ogden*, 9 id. 196.

So that in the language of the learned Justice McLean, with whom Justices Wayne, Catron, McKinley and Grier concurred, in the Passenger Cases above cited: "Whether we consider the nature of the commercial power, the class of powers with which it is placed, the decision of the supreme court of the United States in *Gibbons* v. *Ogden*, reiterated in *Brown* v. *Maryland*, and often reasserted by Mr. Justice Story, who participated in these

decisions, we are brought to the conclusion that the power to regulate commerce with foreign nations and among the several States is exclusively vested in congress, and that no State can exercise any part of that power." This is. not only sustained by all the decisions of the supreme court of the United States, but by every approved rule of construction, and, in conclusion upon this point, we refer to the dissenting opinion of Mr. Justice STORY (which is sustained in the Passenger Cases above), in the case of *The City of New York* v. *Miln*, 11 Pet. 158; *Houston* v. *Moore*, 5 Wheat. 22; 2 Story's Com. on Const., § 1063; 1 Kent's Com. (11th ed.) 436, 437, marginal; *Groves* v. *Slaughter*, 15 Pet. 511.

IV. The transaction in the case at bar is commerce among the States. Is the carrying of passengers, freight and property, on the way from any State to another State, for *compensation* or *hire*, commerce? If it is, it is commerce among the several States, and cannot be regulated in any manner by State legislation.

1. Commerce is commercial intercourse between nations and parts of nations in all its branches. *Gibbons* v. *Ogden*, 9 Wheat. 191, *et. seq.*; 2 Story's Com. on Const., § 1057.

2. Commerce consists in selling the superfluity, in purchasing articles of necessity, as well productions as manufactures, in buying from one nation or State, and selling to another, *and in transporting the merchandise from the buyer to gain the freight. Passenger Cases*, 7 How. 416.

3. Commerce is an exchange of commodities, and includes navigation and intercourse, and extends to the transportation of *passengers* and *property* for *hire. Passenger Cases*, 7 How. 401.

4. Suppose a cargo of cotton is shipped from New Orleans to New York, by way of the Mississippi river to Cairo, thence by the Illinois Central railroad to Chicago, and thence by lake or rail, is it a commercial transaction among the several States? It is admitted that no State

can interfere with or regulate the master of the vessel, the vessel, the cargo or the freight, or the compensation or hire while on the river or lake. Can such State do any of these while it is on the railroad? The cargo, the carrier, the compensation are identical. It is one commercial transaction from the point of departure to the place of destination. Is any one of these less entitled to constitutional protection than another? Is it any less commerce among the several States on land than water? Is it the subject of State legislation in Illinois and not in Louisiana? Are the people of the one State to be permitted to regulate it, or compel the carrier to do so under heavy penalties, and those of the other to be prohibited from such regulation? Suppose it had gone by way of the gulf and ocean, would it be any more a commercial transaction between the citizens of Louisiana and New York, of two or more States? And is there any difference between the transactions viewed in their commercial relations? Would there be any distinction between these and the shipment of a cargo, or a single article, produced or manufactured in the State of Massachusetts or Illinois, and sold by a citizen of either of those States to a citizen of Marshalltown, Iowa, or of San Francisco, California, whether carried by land or water, or partly by one and partly by the other? Is one to be free from State interference or regulation, and the other to be regulated by the laws of every State through which it passes? Is the carrier to look only to the laws of congress and of trade for his government and rights in the one case, and in the other bound to consult the local statutes of half the States in the Union for these, and run the hazard of incurring oppressive penalties in each of them? These are stubborn questions, and the answers to them necessarily settle the character of the transaction involved in this suit to have been a commercial transaction among the several States, subject alone to the exclusive regulation of congress. The idea that one transaction is commerce among the sev-

eral States, on which the States may legislate, and that the other is not, and subject to State action, or that as to part of one transaction it is commerce on which *some States cannot act*, and as to another part of the *same transaction*, it is something without name, subject to the *regulation of some other States*, is so at variance with reason and common sense, that it would only dignify it to pronounce it absurd.

V. The statute is not a police regulation.

1. The statute cannot be sustained on the ground that it is merely a police regulation, because police regulations are, in their very nature, *local*, confined to the States enacting them, and can have no force or operation beyond those things which are purely internal to such State. If they extend to or affect a commercial transaction between two or more States, or the citizens of two or more States, they so far cease 'to be police regulations, and become regulations of commerce among the several States, and in conflict with the power of congress over that subject, and with the regulations which congress has wisely seen fit to provide for its protection and government.

2. Police is the due *regulation and domestic order* of the kingdom, whereby the *individuals of the State*, like the members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, and to be decent, industrious and inoffensive. 2 Blacks. 162, marg.; see, also, Bouv. Law Dict. Justice BALDWIN, in *Groves* v. *Slaughter*, 15 Pet. 511, gives the true distinction between police regulations on the part of the State, and commercial regulations among the several States, by congress, that is: police relates only to the *internal concerns* of one *State*, and commerce within such State is purely a matter of internal regulation, *when confined to those articles which have become so distributed as to form items of the common mass of property in the State*, but any regulation which affects the

Fuller v. The Chicago & N. W. R. R. Co.

*commercial intercourse between two or more* States, or the citizens of two or more States, is within the powers *granted exclusively* to congress, while those regulations which affect commerce carried on *within* one State, or which refer only to subjects of *internal police*, are within the powers reserved to the States.    See, also, 7 How. 422, *et seq.*, and the *License Cases*, reported in 5 id. 504.    In this latter case there was no opinion pronounced by the court, but each justice gave his own reasons for affirming the decisions of the State courts, the sum of which was, that in these cases the State laws did not operate upon commerce *authorized* by any law of congress; that they were in the nature of police regulations for the protection of the *health* and *morals* of the citizens, and to prevent pauperism and crime within the States, having no force or effect beyond the internal concerns of such States; that if there had been any law of congress authorizing the introduction of gin from Massachusetts into New Hampshire, then the statute of that State could not be sustained.    While on these cases, we cannot forbear a particular reference to the opinion of Chief Justice Taney, than whom there has been no stronger advocate of the right of the State to exercise concurrent powers over commerce.    He says, on page 574, that a law of congress, regulating commerce with *foreign* nations and among the several States, is the supreme law of the land; and on the same page, and following, in reviewing the decision of the court in *Brown* v. *Maryland* he says the court *held*, that an *article authorized by law of congress to be imported, continued to be a part of the foreign commerce of the country while it remained in the hands of the importer, and that no State could, directly or indirectly, impose any burden upon the importer or the property imported beyond what the law of congress had imposed;* that he argued that case on behalf of Maryland and maintained that the State law was valid and constitutional, and persuaded himself at the time he was right,

and that the decision restricted the power of the State more than a sound construction of the constitution warranted, but that *further and more mature reflection* had convinced him that the rule then laid down by the court was *just* and *safe*, and the *best* that could have been adopted for preserving the rights of the United States on the one hand and of the States on the other, and preventing collision between them. These admissions are important for us, coming as they did from one who was ever jealous of " State rights " when in collision with federal authority, and completely refute his own views of the extent of the federal power over commerce among the several States, which is, as he admits, co-extensive with that over *foreign* commerce, and it must be conceded the States cannot, in any. event, regulate the latter, and certainly they can no more the former.

It is so apparent that the Iowa statute cannot be sustained as a police regulation, so far as it affects a commercial transaction between the citizens of Illinois, or Massachusetts, and the citizens of Iowa, as in the case at bar, that we crave the pardon of the court for citing any authorities upon the subject.

3. Nor can the statute be sustained because certain States have regulated pilotage, for they derive all authority for that purpose from the laws of the United States. See § 4, acts August 7, 1789, 1 U. S. Statutes at Large, 54, also *Cooley* v. *B. of W. of Phila.*, 12 How. 317.

4. The Iowa act, if applicable to the case at bar, applies as much to the whole line of the defendant's road as to any part of it, to that part in Illinois and Wisconsin as well as in Iowa, and to the freight or compensation earned in another State as to that earned in Iowa; and this is the construction put upon it by the plaintiff, since he claims for an overcharge on the whole carriage from Chicago, Illinois, to Marshalltown, Iowa, and very singularly alleges that the defendant *had posted its rates and classification*

*at all its stations and depots in Illinois and Iowa, save only Marshalltown.*

5. If the statute applies to any part of the freight earned from Boston, Massachusetts, or from Chicago, Illinois, to Marshalltown, Iowa, so as to fix the liability in this action, it must be held, as plaintiff claims, to apply to the whole freight earned, and if such construction as this be given to the statute it certainly cannot be sustained.

6. The goods themselves, and every thing pertaining to their transportation, including the compensation, was commerce between two or more States; and as such was not subject to State legislation, in any of its branches, from the moment of consignment until fully delivered to the plaintiff, and the carrier had received its compensation for the carriage — the payment of freight in all commercial transactions being a condition precedent to delivery.

*Boardman, Brown & Williams* for the appellee.

BECK, J. — Section 2, chapter 169, acts of the ninth general assembly is in the following words: "In the month of September, annually, each railroad company shall fix its rates of fare for passengers and freight, for transportation of timber, wood and coal, per ton, cord, or thousand feet, per mile; also its fare and freight per mile for transporting merchandise, and articles of the first, second, third and fourth grades of freight, and, on the first day of 'October following, shall put up at all stations and depots on its road, a printed copy of such fare and freights, and cause a copy to remain posted during the year. For willfully neglecting so to do, or for receiving higher rates of fare or freight than those posted, the company shall forfeit not less than one hundred dollars nor more than two hundred dollars to any person injured thereby and suing therefor."

1. RAILROAD: effect of statute penalty: act of 1862.

The petition claims to recover the penalty provided by

this section for several cases of alleged overcharge upon merchandise transported upon defendant's road; for the penalty imposed for willful neglect to post copies of rates of fare and freights, which, it is alleged, defendant omitted to do, and for certain sums overcharged by defendant for the transportation of the merchandise in the cases where the penalties are sought to be recovered. The defenses pleaded are a general denial of the causes of action, and that the statute authorizing the recovery of the penalties is in conflict with the constitution of the United States, and therefore void. To the defense last named a demurrer was sustained by the court, and the ruling thereon is made one of the grounds of the assignment of errors. Other questions are presented arising upon the admission of evidence, and instructions to the jury, given and refused. The questions thus raised will be determined in the order in which they are presented for our consideration in the brief of defendant's counsel.

I. It is insisted that if plaintiff may recover the penalties for which he has brought suit, he is entitled to them alone, and cannot recover the amount charged in excess of the rates fixed by the defendant. "An overcharge before the passage of the act was attended with no other consequences than liability to pay it back. * * * Now that the statute has provided a penalty for the act, the penalty only can be enforced." Such is the language of defendant's counsel used in stating their position. The act in question is not intended to deprive the owner of merchandise — the injured party — of any right; neither is the penalty imposed intended as a compensation to him for loss or damage sustained by the act of the railroad. It is intended, as all other penalties, to deter those who may come under the terms of the act from violating its provisions, and is in the nature of a forfeiture, for an illegal act done, to be recovered at the suit of the party injured. Before the act in question, as is admitted by defendants' counsel,

in case of overcharge the railroad would have been liable for the amount wrongfully collected. If the act takes away no right of plaintiff he may still recover it. The recovery of the penalty and overcharge will not be in the nature of a double punishment. The recovery of the overcharge is no punishment at all; it is for a sum justly due plaintiff, and therefore defendant is required to pay it. The penalty is the punishment for defendant's wrongful act. If counsel's views are correct, violations of the law, when more than $200 of overcharge are collected, would present cases where the law could not be enforced without gross injustice. If the penalty is recovered the offending party would be acquit of liability for the overcharge, and would thereby be a gainer by his violation of the law. If the overcharge is collected he could not be prosecuted for the penalty. In such cases the law would be practically defeated, and an inducement held out for great offenses against it. The authorities cited by defendant's counsel in support of his view apply to criminal cases.

II. It is claimed that the alleged overcharges were voluntarily paid, and, therefore, cannot be recovered in this action. The principle of law here announced 2. —— estoppel. need not be examined. The question of fact involved was for the jury to determine; we are unable to say that it was not correctly determined by them. Another principle of law is applicable to the case and must be noticed in this connection. If the payment was made by plaintiff in ignorance of the rates which defendant was permitted to charge, he could recover. There was evidence tending to prove such ignorance, and thereon that fact was determined, we cannot say improperly, by the jury. There were no instructions given or refused upon these points, and we can only consider them as we have, in connection with the objection made by defendant, that the verdict of the jury is contrary to the evidence.

III. It is next insisted that the verdict of the jury is not supported by the evidence. The principal reliance of defendant's counsel to support this position is in the fact, as he claims, that the evidence does not establish that the overcharges were made, and the posting of the rates neglected by defendant, *willfully*. The peculiar language of the statute will be noticed. The word "willfully" occurs in declaring the forfeiture to be enforced. Willful neglect in posting the rates is a cause of forfeiture. Receiving higher rates of fare or freight than those posted is another cause of forfeiture, but it is not prescribed that this last act must be done *willfully* in order to incur the penalty.

3. —— character of intent.

It is said by defendant's counsel that the word "willfully" implies the idea of malice of a mild kind, an evil intent without excuse. Such may be its meaning in indictments and criminal statutes. But it is not to be so understood here. The word means "obstinately, stubbornly; with design; with a set purpose," and this definition must be applied to it where it occurs in the statute under consideration. If defendant "with design or with a set purpose" and not through mistake or inadvertence omitted to post the rates, liability thereupon attaches for the omission. This is the plain meaning of the law. There was evidence tending to prove the omission to post the rates "by design;" the fact was one for the jury and not for the court, for it is an ingredient in the transaction — a fact which goes to establish defendant's liability. The verdict of the jury, in view of the evidence upon this point, as well as upon all of the facts of the case, is sufficiently supported.

IV. A drayman who delivered the goods carried by defendant to the plaintiff was authorized by defendant's agent to collect the charges thereon. When the goods were delivered the plaintiff, as he states in his testimony, informed this drayman that he thought the freight was too high. The evidence as to

4. —— evidence: declarations.

plaintiff's declaration was objected to and is now assigned as a ground of error. It is claimed that, as the party to whom the declaration was made was not the agent of defendant, it could not be considered as a protest or objection to the amount demanded. If it was proper for plaintiff to object upon paying the charges the objection could be made to one authorized to recover them. The evidence, in our opinion, was competent as showing a fact connected with the payment of the overcharges which may be more or less important.

V. It is claimed by defendant that the court instructed the jury that plaintiff could recover a portion of charges upon the goods advanced by defendant to others. No such claim is made in the petition, nor do we find in the record any evidence bearing upon it, and it is not made to appear that any such claim enters into the amount for which the verdict was rendered. The instruction, if given, was error without prejudice. Plaintiff's counsel claim that this instruction appears in the abstract by mistake. This seems a reasonable explanation, as it is utterly inapplicable to the case made by the pleadings and evidence.

VI. The last point made by defendant is, that the statute under which the penalties are recovered is in conflict with 5. —— constitu- the constitution and laws of the United States, tional law: commerce in that it seeks to regulate commerce among between the States. the States, a power conferred, by the constitution, upon congress (art. 1, § 8), and exercised by that body, so far as commerce by the means of railroads is concerned, by the act of June 15, 1866. It is unnecessary to enter further into the question here presented than to inquire whether the act of the general assembly of this State, which is under consideration, does, in fact, attempt to regulate or interfere with commerce.

The statute will first receive our attention, in order to determine its operation and precise effect upon the railroads of the State. It provides: 1st. That, in the month of Sep-

Fuller v. The Chicago & N. W. R. R. Co.

tember of each year, railroad companies shall fix rates of fare for passengers, and charges for the transportation of merchandise; and, on the first day of October, shall post, and cause to remain posted, a copy of such rates, at all its stations and depots. No attempt is here made to regulate the charges of the incorporations for the transportation of merchandise or passengers, nor is there any thing in the provision which can in any way operate to interfere with or prevent the free exercise of the business of the company. It contains no prohibition of the transportation of passengers or the merchandise of the country, nor are any rights of the corporation, as public carriers, curtailed. It is a simple requirement that there shall be certain charges fixed by the company for services rendered by it. It is stated, as an objection, that the statute requires charges to be uniform, so that merchandise must be carried for short distances at proportionately the same rates as are charged for greater distances. Without intimating that this may not be done by the legislature, we are clearly of the opinion that it is not attempted in this act. A cursory glance at the statute will be sufficient to sustain our view. The provision is that the charge shall be fixed at a certain rate per mile. It appears to us that it is perfectly competent for the company, under this act, to fix a certain charge per mile for merchandise from Clinton to Council Bluffs, and a different rate from Clinton to Cedar Rapids. The objection, if at all tenable, has no foundation in the act itself.

We will consider for a moment the reason and object of this statute. Its design is to protect the citizens of the State from impositions in the way of overcharges by the agents and officers of the railroads, acting under the authority of the corporations. In no business, fairly and honestly conducted, will one man or one class of men be charged for commodities received by, or services rendered to, them more than another man or class of men. Among

honest men this is not allowable, and no private citizen would long retain the patronage of the people who indulged in such discriminations. It is contrary to all right 'leas of fairness and honorable dealing in business affairs, ι d is, in fact, a kind of oppression and injustice repulsive tυ all men. In the case of railroad corporations, that monopolize the carrying business of vast regions of country, if indulged in, the practice would result in great oppression and loss to the people. To correct such abuse if it existed, or to prevent its introduction, the statute in question was enacted. After the rates are fixed by the corporation it is very plain that, in order that the people may receive the full benefit thereof, they must be published. If fixed and kept private no benefit could accrue to those doing business with the railroads. The provision requiring the posting of the rates is necessary to effectuate the purpose of the legislature in the enactment of the statute. Unless some sanction is provided for by the law, the duties imposed would not be observed, hence the penalty provided in the act for its violation.

Do the provisions of the statute attempt to regulate commerce? The word "commerce," in its general sense, means "an interchange or mutual change of goods, wares, productions or property of any kind, between nations or individuals, either by barter or by purchase and sale; trade; traffic."—Webster's dictionary. But, adopting the definition given it in its connection as used in the constitution of the United States, it also means intercourse and navigation. Story on Const., §§ 1061, 1062; *Gibbons* v. *Ogden*, 9 Wheat. 189; *Passenger Cases*, 7 How. 276; *Brown* v. *Maryland*, 12 Wheat. 419; *Mayor of New York* v. *Miln*, 11 Pet. 102. We may concede for the purpose of our argument a proposition, which we do not decide, namely, that the transportation of property and persons from State to State upon railroads, constructed and owned by private corporations, is, within the meaning of the term, "commerce."

Admitting, then, that the transportation of property by railroads is commerce in the sense the word is used in the constitution of the United States, does the act in question attempt to regulate it?

As we have seen, it in no sense interferes with the business of the roads, or places any restriction or impediment upon the free transportation by railroads of either property or persons. They are forbidden to carry no kind or character of goods or persons; the time and place, and when and where they should receive and deliver whatever they transport, is not interfered with; the terms, conditions and circumstances under which they shall transact their business are in no manner provided for; in short, transportation upon these roads is just as free, just as untrameled, as it was before the act. The *transportation* itself by these roads is, in no sense, regulated. The regulations of the act extend to the prevention of abuses, injustice and oppression toward the people resulting from the unfair and unlawful practices of the agents and officers of the corporation or of the corporations themselves. It is intended simply for the protection of the people of the State, and in its practical operation has no other effect; and in this view is a police regulation indisputably within the scope of the authority of the State government. If the State may rightfully permit, by fit legislation, railroad corporations from destroying the property of its citizens through the negligent acts of their servants, and provide penalties to be imposed for such acts, may it not interpose its authority to protect the people from greater losses by fraudulent and unfair dealings of such servants or of the corporations themselves? If the most insignificant municipality within the State through which a railroad runs may prescribe the rate of speed to be run by the cars of the corporation engaged in the business of transportation — in commerce, as we consent it may be called — for the purpose of protecting the property or persons of its citizens, may not

the State so legislate as to prevent fraud and impositions by the corporation or its servants? It would be strange, indeed, if the State, to whom the people look for the protection of their private rights and the security of property, is powerless, as against these corporations that owe their very being to charters derived from State legislation, to prevent loss and injury to its citizens by fraudulent and unfair dealing.

It appears to me a reasonable view, though I do not remember to have seen the thought elsewhere suggested, that no State legislative act will be considered obnoxious to the provision of the constitution of the United States, in that it in effect regulates commerce, unless it in some way interferes with the freedom of commerce, or abridges the rights of those engaged therein. In this view the statute under consideration is unobjectionable. As we have seen, it in no way interferes with commerce; it deprives those engaged therein of no rights. It cannot be said that railroad corporations have a right to deal unfairly, fraudulently and oppressively toward those who patronize them. And this is all they are prevented doing by the statute in question.

As we have before intimated, the law in question is founded upon the authority of the State to establish all proper police regulations necessary to preserve the peace, health, morals and property of its people, and to protect them from imposition and injustice. Such laws, while they may even affect commerce and operate upon those engaged therein, are not obnoxious to the constitution of the United States. Quarantine and health laws, under which vessels engaged in commerce may be delayed for weeks in completing their voyages, or cargoes may be seized and destroyed, and sailors and soldiers of the United States imprisoned and punished for their violation; municipal or State regulations for the landing, inspection and disposition of cargoes of vessels; laws prohibiting the

landing of paupers or diseased persons, and requiring reports to be made to municipal or State authorities of passengers upon shipboard, and regulating the running of ferries largely engaged in transporting the merchandise and travel of the country — these, and many others of like character, all designed to promote public prosperity, and to protect the people in their health and morals, and to guard them from frauds, impositions and oppressions, are enacted and sustained under the police power of the States. The law of this State, brought in question in this case, is purely a law of this character, and of its validity we have no doubt. The views above stated, in our opinion, are in accord with doctrines recognized by the United States supreme court. *The Mayor, etc., of New York* v. *Miln*, 11 Pet. 102; *Gibbons* v. *Ogden*, 9 Wheat. 1; *License Cases*, 5 How. 504; *Brown* v. *Maryland*, 12 Wheat. 419; *Passenger Cases*, 7 How. 276.

We need not inquire whether congress has exercised authority by enactment upon the subject of the statute in question, nor discuss other points made in support of the position of defendant's counsel; that it is in conflict with the constitution of the United States, as the views we have above expressed are decisive of the case, and demand the affirmance of the judgment of the circuit court.

Affirmed.