ISAAC GATTON, Appellant, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.

**National Common Law:** CONSTRUCTION. Constitution of the United States, article 3, section 2, providing that "judicial power shall extend to all cases in law and in equity arising under the constitution, laws and treaties of the United States," does not make the common law a part of the national jurisprudence.

SAME. The common law, as such, is not a part of the national jurisprudence.

SAME. Constitution of the United States, article 1, section 8, providing that congress shall have power to regulate interstate commerce vests such power exclusively in congress; and therefore a state cannot authorize a recovery for overcharges for freights on an interstate shipment, involving an unjust discrimination.

SAME. Constitution of the United States, amendment 7, providing that in suits at common law "the right of trial by jury shall be preserved; and no fact tried by a jury shall be otherwise re-examined by any court of the United States than according to the rules of common law," merely established rights so far as the trial is concerned, and does not make the common law a part of the national jurisprudence.

**Interstate Commerce Law: OVERCHARGED: STATE LAW.** Since the common law, as such, is not part of the national jurisprudence and since the exclusive right to regulate commerce is vested in congress, overcharges for freight on an interstate shipment, involving unjust discrimination, made prior to the interstate commerce act, cannot be recovered.

SAME. The interstate commerce act (section 22) providing that the act shall not abridge the remedies "now existing" at common law or by statute, does not confer on the shipper the right to recover overcharges on shipments made prior to the act, on the ground that it recognizes a common law or a statutory liability on the part of the carriers, therefor.

*Appeal from Jasper District Court.*—HON. D. RYAN, Judge.

TUESDAY, MAY 28, 1895.

Action to recover overcharges for freight shipped over defendants line of railway. Judgment on demurrer against plaintiff, and he appeals.—*Affirmed.*

*Alanson Clark* (with whom appear *C. C. Nourse* and *Rickel & Crocker* having like cases) for appellant.

*Robert Mather, H. S. Winslow,* and *E. E. Cook* for appellee.

Kinne, J.—I. The petition in this action is in two hundred and thirty-nine counts, all of which, save in dates of shipments, cars and kinds of stock shipped, and place from which shipped, are alike. The allegations are that the defendant is a railway corporation organized under the laws of the states of Iowa and Illinois,

and engaged in the business of a common carrier, own-
ing and operating its lines of railroad in and through
said states, and that it has for more than ten years last
past so owned and operated said road. It is then averred
that, on live stock shipped from various points in
Iowa over the defendant's line of road to Chicago, the
defendant charged plaintiff's assignors the regular
tariff rate per car, and that during the same time other
parties were also engaged in shipping live stock over
the defendant's road from the same places to Chicago,
Ill., to each of whom the defendant allowed and paid a
rebate or drawback of seventeen dollars on each and
every car of live stock so shipped, thereby requiring
plaintiff's assignors to pay seventeen dollars per car
more than the rate per car exacted of these other ship-
pers; that said shipments so made by plaintiff's assign-
ors were upon like conditions and similar circumstances
as the shipments made by said other parties, and the
services rendered by the defendant were the same in all
of said cases; that the sums charged plaintiff's assign-
ors were unreasonable and extortionate, and seven-
teen dollars per car in excess of a fair and reasonable
rate; that the rate charged was, under the circum-
stances, an unfair and unjust discrimination. Other
necessary allegations are made. The plaintiff prayed
for a judgment of ten thousand dollars. The defendant
denies most of the material allegations of the petition,
pleads the statute of limitations, in an amendment, and,
as a separate defense, defendant pleads that all of said
shipments were interstate shipments, and pertained
exclusively to commerce between the states; that when
said shipments were made the congress of the United
States had not enacted any statute regulating or per-
taining to shipments of that character; that the power
to regulate commerce among the several states is vested
exclusively in congress, and at the time said shipments
were made there was no statute, or any rule of common

law, governing or applicable to said shipments, or forbidding any discrimination or preference in rates.   To this amendment plaintiff demurred, in substance because, in the absence of an act of congress, the common law was in force, and governed as to such shipments, and prevented unjust discrimination, or the charging of unreasonable rates; that the common law inhibitions were not regulations of commerce; that the state law prohibiting unjust discrimination by a common carrier is not obnoxious to the constitution of the United States; that such discrimination is contrary to public policy.    The demurrer was overruled.    The plaintiff excepted, and electing to stand upon his demurrer, and refusing to plead further, the court dismissed his petition, and rendered judgment against him for costs, to which he also excepted.

II.    In this case we have had the benefit of exhaustive and able arguments, at the bar and in print, by eminent counsel.   In addition to the printed argument filed by the appellant's counsel, we have been furnished with like arguments by C. C. Nourse and Messrs. Rickel & Crocker, who have cases pending involving the same question.    We fully appreciate the importance of the question presented, and have devoted much time to its investigation, as well as to an examination of the large number of cases referred to by counsel. The question raised by the demurrer is whether overcharges by a common carrier on interstate shipments, made prior to the taking effect of the interstate commerce act, can be recovered by the shipper. On the one hand, it is insisted that prior to the enactment of that act the common law afforded a remedy in such cases; that the common-law rule forbidding common carriers from making unjust discrimination between shippers for like services rendered under the same circumstances was not violative of the provisions of the constitution of the United States which invested

congress with the power to regulate commerce between the states. Appellee contends that as the right to regulate commerce between the several states was, by the constitution, vested exclusively in congress, and, as congress had enacted no law with reference thereto, there was afforded no relief in such cases; that there was no common law applicable to the United States, as a nation.

It is conceded that prior to the passage of the interstate commerce act there was no statute of the United States which affected the right of a carrier of interstate shipments to make discriminations in freight charges, or to give rebates to one shipper, and to withhold them from another shipper. We think it must also be held that, before congress legislated on this subject of interstate commerce, no state statute could affect charges or discriminations made by a carrier in respect to such shipments. Of this, however, we shall have more to say hereafter. Assuming, then, that the right of recovery, if any exists in this case, must be found outside of the statutes of the state, we inquire, where is it provided for? In determining as to whether there is, or rather was, any common law applicable generally to the United States, as a nation, we may be aided by a consideration of some facts connected with the early history of our country.

It is clear that prior to the Revolutionary War the common law was in force in all of the colonies. Each colony, subject to certain restrictions and limitations, determined its own system of local or municipal law. Each adopted so much of the common law of England as it deemed suited to the wants and necessities of its people. "The colonists who established the English colonies in this country undoubtedly brought with them the common and statute laws of England, as they stood at the time of their emigration, so far as they were applicable to the situation and local circumstances

of the colony." *U. S. v. Reid*, 12 How. 363. "Our ancestors brought with them its general principles, and claimed it as their birthright, but they brought with them and adopted only that portion which was applicable to their situation." *Van Ness v. Pacard*, 2 Pet. 137-144. As is said *In re Barry*, 42 Fed. Rep. 114, in speaking of the common law, "it came to them, and was appropriated by them, and became an integral portion of the laws of the particular states, before the United States government had an existence." The congress of 1774 unanimously resolved that the colonies "are entitled to the common law of England." Journal of Congress, Declaration of Rights of the Colonies; Act 14, 1774, pp. 27-31. Story says that the uniform doctrine ever since the settlement of the colonies, and the uniform principle which has been conformed to in practice, has been that the common law is our birthright and inheritance, "and that our ancestors brought hither with them, upon their emigration, all of it which was applicable to their situation." 1 Story, Const., section 157; 1 Kent, Comm. 471, and notes. In *Town of Parolet v. Clark*, 9 Cranch, 332, it is said, "We take it to be a clear principle that the common law in force at the emigration of our ancestors is deemed the birthright of the colonies, unless so far as it is inapplicable to their situation, or repugnant to their other rights and privileges." In *U. S. v. Worrall*, 2 Dall. 384, Fed. Rep. Cas. No. 16,766. "There is no doubt that the common law is the basis of the laws of those states which were originally colonies of England, or carved out of such colonies. It was imported by the colonists, and established, so far as it was applicable to their institutions and circumstances." *Norris v. Harris*, 15 Cal. 227-252. In Cooley, Const. Lim. pp. 34-37, it is said: "From the first the colonists in America claimed the benefit and protection of the common law. In some particulars, however, the common law, as then existing in

England, was not suited to their conditions and circumstances in the new country, and these particulars they omitted as it was put in practice by them. They also claimed the benefit of such statutes as from time to time had been enacted in modification of this body of rules. * * * The evidence of the common law consisted in part of the declaratory statutes we have mentioned, in part of the commentaries of such men learned in the law as had been accepted as authority, but mainly in the decisions of the courts applying the laws to actual controversies. While colonization continued—that is to say, until the war of the Revolution actually commenced—these decisions were authority in the colonies, and the changes made in the common law up to the same period were operative in America also, if suited to the condition of things here. The opening of the war of the Revolution is the point of time at which the continuous stream of the common law became divided, and that portion which has been adopted in America flowed on by itself, no longer subject to changes from across the ocean, but liable still to be gradually modified through changes in the modes of thought and of business among the people, as well as through statutory enactments."

The common law, then, existed in this country prior to the Declaration of Independence, but it was not a national common law. It was the local law of each colony. They had not yet formed a new nation. Now, when, if at all, did this common law which had become the heritage of the colonists cease to be applicable to the colonies severally, or when did it take on its national character? Surely, not by the Act of Independence, which made the colonies "free and independent states." The mere fact of the emerging of the colonies from their colonial condition into that of independent states did not ingraft the common law, which

had been severally adopted by the colonies, into a general system of national law. It is said that when they became independent they were governed by the common law of England, so far as they had tacitly adopted it as suited to their condition, by the statutes of England amendatory of the common law, and by the colonial statutes. Judge Cooley says that the common law of England, and the statutes amendatory of it, "constituted the American common law, and by this, in great part, are rights adjudged and wrongs redressed in the American states to this day." Cooley, Const. Lim. p. 37. Here the learned author clearly recognizes that the common law he speaks of as being adopted in this country is the common law as adopted by the separate colonies, and not a common law of general national application. As is said *In re Barry*, 42 Fed. Rep. 127: "Although the people brought with them, on their emigration to this country, the essential principles of the common law, and embodied them in their institutions, yet this was not done by them in a *national* capacity (at that time no such character or capacity was contemplated), but as distinct communities, independent of each other." The situation in this respect was not changed by the articles of confederation. As is well said by Prof. Fiske in his work on the Critical Period in American History (page 97): "The articles simply defined the relation of the states to the confederation, as they had already shaped themselves. Indeed, the articles, though not fully ratified till 1781, had been known to congress and to the people, ever since 1776, as their expected constitution, and political action had been shaped in general in accordance with the theory on which they had been drawn up." As yet we discover no reason for saying that there was any national common law prior to the adoption of the constitution of the United States. The apparent necessity of taking from the states, and granting to the general

government, the power to regulate commerce, was an early, if not the first, reason for calling a constitutional convention. Indeed, this power was vested in congress, only after a struggle in the convention, and by virtue of a concession made on the part of the New England states, whereby consent was given to an extension of the foreign slave trade for twenty years. Fiske, 263, 264. The Southern states feared that "the New Englanders would get all the carrying trade into their own hands, and then charge ruinous freights for carrying rice, indigo, and tobacco to the North and to Europe." Fiske, 263. It would seem that all such fears must have been groundless, if the principles of the common law as to carriers—that they should charge only reasonable rates for their services—were to be adopted and established as a national system of jurisprudence, as appellant claims was in fact done. It is a historical fact that the ratification of the constitution had only been accomplished when the very question now before us—as to whether there is a common law of the United States — was the subject of serious consideration in the legislative assemblies, and of judicial inquiry in the courts. On January 11, 1800, the general assembly of the State of Virginia adopted an instruction to their representatives in the United States senate. That document reads: "The general assembly of Virginia would consider themselves unfaithful to the trust reposed in them, were they to remain silent whilst a doctrine has been publicly advanced, novel in its principle and tremendous in its consequences,—that the common law of England is in force under the government of the United States. It is not, at this time, proposed to expose at large the monstrous pretensions resulting from the adoption of the principle. It ought never, however, to be forgotten, and can never be too often repeated, that it opens a new tribunal for the trial of crimes, never contemplated

by the federal compact: It opens a new code of san-
guinary criminal law, both obsolete and unknown, and
either wholly rejected, or essentially modified in almost
all its parts, by state institutions. It arrests or super-
sedes state jurisdictions, and innovates upon state
laws. It subjects the citizen to punishment according
to the judiciary will, when he is left in ignorance of
what this law enjoins as a duty, or prohibits as a crime.
It assumes a range of jurisdiction for the federal courts
which defines limitation or definition." They then
instruct their senators "to oppose the passing of any
law founded on or recognizing the principle lately
advanced, that the common law of England is in force
under the government of the United States; excepting
from such opposition such particular parts of the com-
mon law as may have a sanction from the constitution,
so far as they are necessarily comprehended in the
technical phrases which express the provisions dele-
gated to the government, and excepting also such other
parts thereof as may be adopted by congress as neces-
sary and proper for carrying into execution the powers
expressly delegated." Duponceau Jur. page 225. The
Virginia instructions were no doubt caused by the con-
sideration of this question in 1798 in the case of *U. S.
v. Worrall*, 2 Dall. 384, Fed. Rep. Cas. No. 16,766. That
was an indictment for an attempt to bribe a commis-
sioner of the revenue of the United States. In that
case the court says the question is "whether the courts
of the United States can punish a man for any act
before it is declared by a law of the United States to be
criminal." It is there said: "It is attempted, how-
ever, to supply the silence of the constitution and stat-
utes of the Union by resorting to the common law for
a definition and punishment of the offense which has
been committed. But in my opinion the United States,
as a federal government, have no common law, and con-
sequently no indictment can be maintained in these

courts for offenses merely at the common law. If, indeed, the United States can be supposed, for a moment, to have a common law, it must, I presume, be that of England, and yet it is impossible to trace when or how the system was adopted or introduced. * * * He who should travel through the different states will soon discover that the whole of the common law has been nowhere introduced,—some states have rejected what others have adopted,— and that there is, in short, a great and essential diversity in the subjects to which the common law is applied, as well as in the extent of its application. The common law, therefore, of one state, is not the common law of another. But the common law of England is the law of each state, so far as each state has adopted it. * * * But the question recurs, when and how have the courts of the United States acquired common-law jurisdiction in criminal cases? The United States must possess the common law themselves, before they can communicate it to their judicial agents. Now, the United States did not bring it with them from England, the constitution does not create it, and no act of congress has assumed it. Besides, what is the common law to which we are referred? Is it the common law entire, as it exists in England, or modified as it exists in some of the states; and of the various modifications,which are we to select?" In *U. S. v. Hudson*, 7 Cranch, 32, Justice Johnson, in discussing the question of the common-law jurisdiction of the federal courts, says: "Although this question is brought up now, for the first time, to be decided by this court, we consider it as having been long since settled in public opinion. In no other case for many years has the jurisdiction been asserted, and the general acquiescence of legal men shows the prevalence of opinion in favor of the negative." *U. S. v. Coolidge*, 1 Wheat. 415. Peter S. Duponceau, provost of the law academy of Philadelphia, was an early and eminent

advocate of the theory that the common law was adopted as a federal system.  In his work on Jurisdiction, he says:  "I am well aware that this doctrine of the nationality of the common law will meet with many opponents.  There is a spirit of hostility abroad against this system, which cannot escape the eye of the most superficial observer.  It began in Virginia in the year 1799 or 1800, in consequence of an opposition to the alien and sedition acts.  A committee of the legislative body made a report against those laws, which was accepted by the house, in which it was broadly laid down that the common law is not the law of the United States.  Not long afterwards the flame caught in Pennsylvania, and it was for some time believed that the legislature would abolish the common law altogether.  Violent pamphlets were published to instigate them to that measure.  The whole, however, ended in a law for determining all suits by arbitration in the first instance, at the will of either party, and another prohibiting the reading and quoting in courts of justice of British authorities of a date posterior to the Revolution.  *  *  *  It was not long before this inimical disposition towards the common law made its way into the state of Ohio.  In the year 1819 a learned and elaborate work was published in that state, in which it was endeavored to prove, not only that the common law was not the law of the United States, but that it had no authority in any of the states that had been formed out of the old Northwestern Territory.  *  *  *  In other states, attacks upon the common law, more or less direct, have appeared from time to time."  Duponceau Jur. pages 102, 103.  In this same work, and in support of his contention that the constitution adopted the common law of England as a national system of law, the author says:  "But why need I go into such a wide argument to prove what I consider a self-evident principle?  We live in the midst of the common law; we

inhale it at every breath, imbibe it at every pore; we meet it when we walk, and when we stay at home; it is interwoven with the very idiom that we speak; and we cannot learn another system of laws without learning at the same time another language. We cannot think of right or wrong, but through the medium of ideas that we have derived from the common law."

This may all be true, as applied to the existence of the common law as the local law of the states; but, in and of itself, it does not tend to establish the claim that we have a common law of the United States, national in its character and application. The doctrine that by the adoption of the constitution the people had accepted and established the heretofore existing common law as a rule of national action, and of general application, was not only in the early history of our nation, originally combated, but was denied by the courts in the cases in which it was then discussed, as we have attempted to show. We have treated at some length of the historical phase of this question, as, to our minds, the subsequent discussion of the question will thereby be the better understood.

III. From the foregoing discussion it is clear that any rule of the common law affecting interstate shipments, to be effectual as to such shipments, must have had the legislative sanction of the congress of the United States, or, in the absence thereof, the rules of the common law must have become a part of the system of laws of the national government, the same as they become a part of the legal system of many of the states of the Union. The constitution of the United States provides "that judicial power shall extend to all cases in law and equity, arising under this constitution; the laws of the United States, and treaties made, or which shall be made, under their authority:   *   *   *   to all cases of admiralty and

maritime jurisdiction." Article 3, section 2. It is contended that the above provision is a clear recognition of the existence of the several systems of law, equity, and admiralty, and that by this constitutional provision the systems are not created, but their existence is simply recognized, and the extent of federal jurisdiction in regard thereto fixed. Now, it is to be observed that, as to admiralty and maritime jurisdiction, the language used is without restriction or limitation. It is, "the federal power shall extend  *  *  *  to all cases of admiralty and maritime jurisdiction." It is not provided that the judicial power shall extend to all cases of law and equity jurisdiction, without limitation. But the provision is that it "shall extend to all cases in law or equity, *arising under this* constitution, the laws of the United States," etc. So it will be seen that, as to admiralty, jurisdiction extends "to all cases of admiralty and maritime jurisdiction," while, as to law and equity, the judicial power is extended to all cases which arise under the constitution, the laws of the United States, and treaties. In the latter case there is a fixed limitation as to the extent of judicial power. The particular cases to which such power is extended are expressly pointed out. If the provision was that the judicial power should extend to all cases of law and equity jurisdiction, or its equivalent, its meaning would obviously be different. So, then, the jurisdiction thus conferred by the constitution as to cases in "law and equity" is limited by what follows as to cases arising under the constitution, etc. In other words, it seems to us that to give the words "in law and equity," as used in the constitution, the meaning contended for, is to ignore the meaning and effect of the qualifying words which follow them. Reading the entire sentence, it is reasonably clear that the words "in law and equity" are not used to describe a system or systems of jurisprudence then or theretofore

·in existence. The jurisdiction is as to cases in law or equity "arising under" the constitution, laws, and treaties. We are then to look to the constitution, the laws of the United States, and to its treaties, to determine what rights are given. The rights conferred by this provision do not arise by reason of a constitutional recognition of the common-law system, but are conferred, as to cases at law or in equity, by the constitution itself, the laws of the United States, or by its treaties. If not embraced within these, they cannot be said to be given. Now, a supposed right is sought to be enforced at law or in equity, but such right, if it exists at all, must arise—that is, exist or be given—by the constitution or laws of the United States, or its treaties. The constitution and laws of the United States fix, establish, and give certain rights. In the attempt to assert or defend such rights, "cases" arise. In some of them the remedy applicable would be furnished by an application of the rules of the common law; in others, by principles of equity. So there are cases "at law or in equity," so far as the proper method of procedure or remedy is concerned; but as to the rights given, upon which such cases are based, they are to be found by a resort to the constitution, laws of the United States, and its treaties. Jurisdiction, then, is not conferred by any express or implied recognition or adoption of the common law; but when it attaches under the constitution, laws, or treaties of the United States, the remedies afforded for the enforcement of the rights thus granted are to be in accordance with the course of the common law. In brief, the position we take is that the provision of the constitution of the United States under consideration is to be interpreted as providing that rights are conferred by the constitution, laws of the United States, and its treaties, while the remedies for the securing of these rights are to be at common law, or according to the principles

of equity, as the case may be. It is said in *Robinson v. Campbell*, 3 Wheat. 222: "By the laws of the United States, the circuit courts have cognizance of all suits of a civil nature, at common law and in equity, in cases which fall within the limits prescribed by these laws. * * * The court therefore think that, to effectuate the purpose of the legislature, the *remedies* in the courts of the United States are to be at common law, or in equity,—not according to the practice of state courts, but according to the principles of common law and equity, as distinguished and defined in that country from which we derive our knowledge of those principles." In *Irvine v. Marshall*, 20 How. 564, it is said: "With regard to the fourth objection,—want of jurisdiction in the courts of the United States, in the absence of express statutory provisions, to recognize and enforce a resulting trust, * * * —it is a sufficient response to say that the jurisdiction of the courts of the United States is properly commensurate with every *right and duty* created, declared, or necessarily implied, by and under the constitution and laws of the United States. Those courts are created courts of common law and equity, and under whichsoever of these classes of jurisprudence such rights or duties may fall, or be appropriately ranged, they are to be taken cognizance of and adjudicated according to the settled and known principles of that division to which they belong. By the language of the constitution, it is expressly declared that the judicial power of the United States shall extend to all cases in law and equity arising under the constitution, the laws of the United States, and treaties made under their authority. By the statute which organized the judiciary of the United States, it is provided that the circuit courts shall have jurisdiction of suits of a civil nature at common law or in equity. In the interpretations of these clauses of

the constitution and the statute, this court has repeatedly ruled that by 'cases at common law' are to be understood suits in which legal rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognized, and equitable remedies administered. * * * Can these courts, consistently with their duty, refuse to exert those powers and that jurisdiction for the protection of rights *arising* under the constitution and laws, in the acceptation in which both have been interpreted and sanctioned?" These cases, we think, support our conclusion that rights are to be given by the constitution, the laws of the United States, or its treaties, but remedies for such rights are to be pursued in accordance with the course of the common law. If we are right in this view, it follows that the constitution does not confer upon the courts of the United States full common law jurisdiction, in a national sense, as claimed by appellant.

IV.   Section 8 of article 1 of the federal constitution provides that "the congress shall have power * * * to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." In this section it is further provided that congress shall have power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." It may be that, even though the common law was a part of our national system of laws, and that under it a right was given to recover in a case like that at bar, still such right would be taken away by the provision of the constitution above quoted, in view of the fact that the power therein conferred has been held to be exclusive in congress. It has often been held that the power thus conferred was exclusive; that it had the effect to prohibit legislation thereon, so far as it pertained to interstate commerce, and to a regulation thereof. "Whatever may be the power of

a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate than it can that which is with foreign nations. Power over one is given by the constitution of the United States to congress, in the same words in which it is given over the other, and in both cases it is necessarily exclusive." *Railroad Co. v. Husen*, 95 U. S. 465-469. "Whatever subjects of this power are, in their nature, national, or admit only of one uniform system or plan of regulation, may justly be said to be of such a nature as requires exclusive legislation by congress." *Cooley v. Board*, 12 How. 299. "Whenever the terms in which a power is granted to congress, or the nature of the power, require that it should be exercised exclusively by congress, the subject is as completely taken from the state legislatures as if they had been expressly forbidden to act upon it." *Sturgis v. Crownshield*, 4 Wheat. 122; *Brown v. Maryland*, 12 Wheat. 419. In *Smith v. Alabama*, 124 U. S. 465-473, 8 Sup. Ct. Rep. 564, it is said: "As the regulation of commerce may consist in abstaining from prescribing positive rules for its conduct, it cannot always be said that the power to regulate is dormant because not affirmatively exercised. And when it is manifest that congress intends to leave that commerce, which is subject to its jurisdiction, free and unfettered by any positive regulations, such intention would be contravened by state laws operating as regulations of commerce as much as though these had been expressly forbidden. In such cases the existence of the power to regulate commerce in congress has been construed to be not only paramount, but exclusive, so as to withdraw the subject, as the basis of legislation, altogether from states." *Hall v. De Cuir*, 95 U. S. 485-507. So it was held in *Welton v. Missouri*, 91 U. S. 275, and *Brown v. Houston*, 114 U. S. 622, 5 Sup. Ct. Rep. 1091, that the inaction of congress

with reference to legislation touching interstate commerce is equivalent to a declaration that such commerce shall be free and untrammeled. *Wabash, St. L. & P. R. Co. v. People of Illinois*, 118 U. S. 557, 7 Sup. Ct. Rep. 4; *County of Mobile v. Kimball*, 102 U. S. 697; *Robbins v. Taxing Dist.*, 120 U. S. 493, 7 Sup. Ct. Rep. 592; *Leisy v. Hardin*, 135 U. S. 109, 10 Sup. Ct. Rep. 681; The Federal Power over Commerce, by William Draper Lewis (pages 122, 123); *Carton v. Railroad Co.*, 59 Iowa, 151 (13 N. W. Rep. 67). From the foregoing discussion it will be observed that, as to the regulation of interstate commerce, the power of congress is exclusive, and it is none the less so though congress may not have legislated with respect thereto. In either event the states have no power to regulate such commerce.

V. No right of recovery, then, in this case, is or can be given by virtue of the statutes of the states, it being a matter exclusively within the jurisdiction of congress. No statute of the United States creates a right in such a case. If, then, there exists any right of recovery, it must be by virtue of the existence of the common law as a recognized part of our national system of jurisprudence. We have said that the constitution of the United States did not, of itself, recognize the existence of the common law as a system of jurisprudence of national application. Even if it should be conceded that efficacy could be given to such a system, and make it of national application, in the absence of constitutional or statutory recognition, by means of judicial decisions of the United States supreme court,—a point not necessary for us to decide,— do the decisions of that court go to that extent? That court has never determined the precise question involved in this action, but it has passed upon questions of interstate commerce, and its attempted regulation by the states. In *U. S. v. Worrall*, 2 Dall. 384, Fed. Cas. No. 16,766, a

case where one was tried under an indictment for attempting to bribe a commissioner of the revenue of the United States,—it was held that the defendant could not be punished, inasmuch as there was no federal law declaring the act done to be a crime. It is therein said: "It is attempted, however, to supply the silence of the constitution and statutes of the Union by resorting to the common law for a definition and punishment of the offense which has been committed. But in my opinion the United States, as a federal government, have no common law.   *   *   *   If, indeed, the United States can be supposed, for a moment, to have a common law, it must, I presume, be that of England, and yet it is impossible to trace when or how the system was adopted or introduced.   *   *   *   But the question recurs, when and how have the courts of the United States acquired a common-law jurisdiction in criminal cases? The United States must possess the common law themselves, before they can communicate it to their judicial agents.   Now, the United States did not bring it with them from England, the constitution does not create it, and no act of congress has assumed it.   *   *   *   Upon the whole, it may be a defect in our political institutions, it may be an inconvenience in the administration of justice, that the common-law authority relating to crimes and punishments has not been conferred upon the government of the United States, which is a government of limited jurisdiction; but judges cannot remedy political imperfections, nor supply any legislative omissions."   The same question was decided in the same way by the United States supreme court.   *U. S. v. Hudson*, 7 Cranch, 32.   In *U. S. v. Railroad Bridge Co.*, 6 McLean, 517, Fed Cas. No. 16,114, referring to this common-law question, it is said: "The instrumentality of the judiciary can be invoked only by the government to give effect to its laws, civil or criminal, but the judicial power cannot precede that of legis-

lation. The rule of action on all questions of policy within the federal power must be prescribed by congress. There is no federal common law, which pervades the Union, and constitutes a rule of judicial action. But in all the states the common law is in force, in a greater or less degree. Its existence and extent are shown by the statutes of the states, respectively, and the usages of the courts. But there is no common law in regard to regulations of navigation. These must be adapted to the peculiar circumstances of a country, and the facilities which exist for traffic. In this respect the legislation of congress is the only remedy known to the constitution." Again it is said, "There is no unwritten or common law of the Union." Lorman v. Clarke, 2 McLean, 568-572, Fed. Cas. No. 8,516. It is held in Wheaton v. Peters, 8 Pet. 591, 657, 658: "It is clear, there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent states, each of which may have its local usages, customs, and common law. There is no principle which pervades the Union, and has the authority of law, that is not embodied in the constitution or laws of the Union. The common law could be made a part of our federal system only by legislative adoption. When, therefore, a common-law right is asserted, we must look to the state in which the controversy originated." In Bucher v. Railroad Co., 125 U. S. 583, 8 Sup. Ct. Rep. 974, it is said, "There is no common law of the United States, yet the main body of the rights of the people of this country rest upon, and are governed by, principles derived from the common law of England, and established as the ws of the different states." In Smith v. Alabama, U. S. 465-475, 8 Sup. Ct. Rep. 564,—a case relating censing of locomotive engineers by a state,—in the common law as it prevails in the sev is said: "It does not emanate from the

authority of the national government, nor flow from the exercise of any legislative powers conferred upon congress by the constitution of the United States, nor can it be implied as existing by force of any other legislative authority than that of the several states in which it is enforced.    *    *    *    But for the provisions on the subject found in the local law of each state, there would be no legal obligation on the part of the carrier, whether *ex contractu* or *ex delicto*, to those who employ him; or, if the local law is held not to apply when the carrier is engaged in foreign or interstate commerce, then, in the absence of laws passed by congress, or presumed to be adopted by it, there can be no rule of decision based upon rights and duties supposed to grow out of the relation of such carrier to the public, or to individuals.    In other words, if the laws of the particular state do not govern that relation, and prescribe the rights and duties which it implies, then there is, and can be, no law that does, until congress expressly supplies it, or is held by implication to have supplied it, in cases within its jurisdiction over foreign and interstate commerce.    The failure of congress to legislate can be construed only as an intention not to disturb what already exists, and is the mode by which it adopts, for cases within the scope of its power, the rule of the state law, which, until displaced, covers the subject.    *    *    *    There is no common law of the United States, in the sense of a national customary law, distinct from the common law of England, as adopted by the several states, each for itself, applied as its local law, and subject to such alterations as may be provided by its own statutes." Again, in *Transportation Co. v. City of Parkersburg*, 107 U. S. 691, 700, 2 Sup. Ct. Rep. 732, it is said: "Be this, however, as it may, it is an undoubted rule of universal application that wharfage for the use of all public wharves must be reasonable; but then the question arises, by what law is this rule established

and by what law can it be enforced?  By what law is it to be decided whether charges are or are not extortionate?  There can be but one answer to these questions. Clearly, it must be by the local municipal law, at least until some superior or permanent law has been prescribed.  At Parkersburg, it is the law of West Virginia.  The rule referred to is a rule of the common law, undoubtedly, but it has force in West Virginia because the common law is the law of that state, and not because it is the law of the United States.  The courts of the United States do not enforce the common law, in municipal matters in the states, because it is the federal law, but because it is the law of the state." In *Kendall v. U. S.* 12 Pet. 524-621, the court says: "The common law has not been adopted by the United States as a system in the states generally, as has been done with respect to this district." (Columbia.) Again, in the case of *The Scotland,* 105 U. S. 24-32, it is said, "As for the civil and common laws, they are only municipal laws, where they have the force of laws at all." *In re Barry,*—a case decided in the United States circuit court of the Southern district of New York, which is approved by the supreme court of the United States in the case of *In re Burrus,* 136 U. S. 586, 10 Sup. Ct. Rep. 850, and which is found reported in 136 U. S. 597, and also in 42 Fed. Rep. 113,—it was held that the United States circuit court could not exercise the common-law function of *parens patriae,* and therefore had no jurisdiction over the matter, there being no statute conferring jurisdiction.  In the course of that opinion, it is said (136 U. S. 605, 42 Fed. Rep. 113): "Though the point has been labored with ability by a late jurist of eminence in this department of legal learning, to deduce from the circumstances attendant upon the establishment of this government that the common law became embodied in it, as an efficient principle of its authority and action (Dup. Jur. 85-90), yet

the doctrine has never been declared or sanctioned by
our courts. So far as the decisions have gone, they
tend to repudiate the principle *in toto.  U. S. v. Hud-
son,* 7 Cranch, 32; *U. S. v. Coolidge,* 1 Wheat. 415." On
page 617, 136 U. S., and page 113, 42 Fed. Rep. it is said:
"Nor has the common law been adopted by the United
States as a system applicable to the states generally,
and to be administered as such in the national courts.
*Kendall v. U. S.,* 12 Pet. 624.  This has been done spe-
cifically, by act of congress, in relation to the District
of Columbia.  Id. 621.  But in respect to the states the
common law is regarded in force only as adopted or
modified by the constitution, statutes, or usages of the
states, respectively.  It came to them, and was appro-
priated by them, and became an integral portion of the
laws of the particular states, before the United States
government had an existence."  The case of *Wabash,
etc., Ry. Co. v. People of Illinois,* 118 U. S. 557, 7 Sup.
Ct. Rep. 4, was where a statute of Illinois provided that
if any railroad company shall, within that state, charge
or receive for transporting passengers or freight of the
same class the same or a greater sum for any distance
than it does for a longer distance, it shall be liable to a
penalty for unjust discrimination.  The railway com-
pany made such a discrimination in regard to goods
transported over the same road or roads from Peoria,
in Illinois, and from Gilman, in Illinois, to New York,
charging more for the same class of goods carried from
Gilman than from Peoria; the former being eighty-six
miles nearer to New York than the latter, this differ-
ence being in the length of the line within the state of
Illinois.  The court held that the statute must be con-
strued to include a transportation of goods, under one
contract and one voyage, from the interior of the state
of Illinois to New York; that such statute was void, as
an interference with interstate commerce.  That case
quotes approvingly from *County of Mobile v. Kimball,*

102 U. S. 691-702, where it is said, "For the regulation
of commerce, as thus defined, there can be only one sys-
tem of rules, applicable alike to the whole country, and
the authority which can act for the whole country can
alone adopt such a system." Continuing in the *Wabash
Case*, the court says, "And if it be a regulation of com-
merce, as we think we have demonstrated it is, and as
the Illinois court concedes it to be, it must be of that
national character, and the regulation can only appro-
priately exist by general rules and principles, which
demand that it should be done by the congress of the
United States under the commerce clause of the consti-
tution." In the recent case of *Swift v. Railroad Co.*,
58 Fed. Rep. 858, and 64 Fed. Rep. 59, it was held by the
circuit court of the United States for the Northern dis-
trict of Illinois that there was no federal common law.

Whenever this question of the existence of a fed-
eral common law, as contradistinguished from the com-
mon law adopted by the several states, has arisen in the
state courts, it has been decided that no such law
exists. In *People v. Folsom*, 5 Cal. 379, it is said:
"Now, there is no common law of the United States, as
contradistinguished from the individual states, and the
courts of the United States, instead of administering
the common law, or any particular system, conform to
the laws of the states where they are situated; so that
the acquisition of California did not extend over it the
common law." In *Norris v. Harris*, 15 Cal. 227-252, the
same doctrine is reaffirmed. And so in *Garner v.
Wright*, 52 Ark. 385, 388, 12 S. W. Rep. 785, it is held
that no presumption obtains as to the existence of the
common law in states like Louisiana and Texas, whose
jurisprudence is not based upon the common-law sys-
tem. Judge Cooley, in his able work on Constitutional
Limitations, says the United States courts have no "com-
mon-law jurisdiction." Cooley, Const. Lim. page 526.
In an article in the *Forum* of April, 1894, entitled, "Has

the interstate commerce law been beneficial?" written by Adlace F. Walker, formerly a member of the interstate commerce commission, and an eminent lawyer, we find the following:    "Yet, under our combined state and federal system of government, there was no way in which they could be judicially applied to commerce crossing state boundaries until the passage of the interstate commerce law."

We now proceed to a consideration of authorities claimed by appellant to support the contrary view.   It is said that in *Cox v. U. S.*, 6 Pet. 172-203, it is held that the "liability of the parties must be governed by the rules of the common law."   And, to the same effect, we are cited to *Duncan's Heirs v. U. S.*, 7 Pet. 435.   Neither of these cases, to our minds, affords the slightest reason for holding that we have a national common law.    The first case was an action upon a bond executed to the United States by a navy agent and his sureties, in the state of Louisiana, conditioned that the agent would faithfully account for public moneys which came into his hands.   Suit was brought by the government, in the state of Louisiana, for a breach of the bond, in the United States district court.    Under the Louisiana law the United States would have been entitled to take judgment against each surety only, for his proportion of the bond, and the trial court applied that rule.   The supreme court of the United States held that liability was to be determined by the place of performance of the contract, and applied the common-law rule, because, by act of congress, the common law was in force in the District of Columbia,—the place of performance of the contract.   The other case was decided on the same principle.   *Swift v. Tyson*, 16 Pet. 1, was a case touching negotiable paper, and the court said:    "But, admitting the doctrine to be fully settled in New York, it remains to be considered whether it is

obligatory upon this court, if it differs from the princi-
ples established in the general commercial law.    It is
observable that the courts of New York do not found
their decisions upon this point upon any local statute, or
positive, fixed, or ancient local usage, but they deduce the
doctrine from the general principles of the commercial
law."   Now, there was nothing in this case indicating
that the court decided this case on the theory that there
was a national common law.   On the contrary, the
New York court had based its decision on the general
principles of commercial law.    What commercial law?
Why, manifestly, as interpreted by the courts of that
state, as applicable in that jurisdiction.    The federal
court held it was not bound by such interpretation of
the state court.    To the same effect are the cases of
*Oates v. Bank,* 100 U. S. 239, and *Brooklyn City & N. R.
Co. v. National Bank of N. Y.,* 102 U S. 14.   *Fenn v.
Holme,* 21 How. 481, relates to the forum—law or
equity—of the trial, and not to the ascertainment of
rights as given at common law.   *Railroad Co. v. Lock-
wood,* 17 Wall. 357, involved no question of interstate
commerce.   Lockwood, who was injured, was being
transported upon a free pass from Buffalo to Albany,
both places being within the same state.   It was held
that the question of the power of the carrier to exempt
itself by contract from liability placed upon it at com-
mon law was to be decided by the federal court upon
the grounds of public policy.   And it was expressly
said in a later case that the law applied in *Lockwood's
Case* was the law of the state of New York.   *Smith v.
Alabama,* 124 U. S. 465, 8 Sup. Ct. Rep. 564.  In *Kohl v. U.
S.* 91 U. S. 367, the main question was whether the pro-
ceeding to condemn property by the general government
was a suit at common law.   The opinion is to the effect
that power was conferred by acts of congress to con-
demn, but no machinery or method by which condemna-
tion should be made had been enacted.   The question

was whether, in the absence of express legislation, the government had power, by proceeding at common law, to perfect condemnation. By a reading of the opinion, it will be observed that the existence of the power or right to condemn was given or existed outside of the common law, and the discussion turned upon the question as to whether the exercise of the right should or should not be according to the course of the common law,—a question as to the means of exercising the right, and not as to determining the existence of it. It was a question, in other words, pertaining to the remedy, not the right. The case of *Atchison, T. & S. F. R. Co. v. Denver & O. R. Co.*, 110 U. S. 667, 4 Sup. Ct. Rep. 185, does not necessarily involve the question of interstate commerce. The court says that the constitution. of Colorado, prohibiting discrimination "within the state," imposes no greater obligation upon the company than the common law would have done. At most, the holding in this case seems to be to the effect that, so far as transportation wholly within the state was concerned, in the absence of legislative regulation, the railway company would owe such duties to the public as the common law, or some custom having the force of law, had established for its government. We discover no grounds for claiming that the common law referred to in the opinion was any other than that of the state of Colorado. In *Railroad Co. v. Baugh,* 149 U. S. 368, 13. Sup. Ct. Rep. 914, it is said: "But, passing beyond the matter of authorities, the question is essentially one of general law. It does not depend upon any statute; it does not spring from any local usage or custom; there is in it no rule of property; but it rests upon those considerations of right and justice which have been gathered into the great body of rules and principles known as the 'common law.' There is no question as to the power of the state to legislate, and change the rules of the common law, in this respect, as in others, but in the

absence of such legislation the question is one determin
able only by the general principles of that law." Now
if this common law referred to in the foregoing opinion
is susceptible of being abrogated by the legislature of
the state, as is held, then, clearly, the writer did not
refer to a national common law at all.   If the language
used refers to a national common law, it is a holding
that a state legislature might abrogate and render inef-
fective such laws, and if such a doctrine were followed
to its logical result, and applied to the case at bar, it
would amount to saying that although there was a
national common law, as a system of jurisprudence, of
the general government, by means of which a right was
given plaintiff for redress in this case, still the state,
at its election, could step in and deprive the suitor of
such right, though we apprehend that, if such right was
so given by virtue of a national system of jurisprudence
adopting the common law for the general government,
the state could no more interfere with it, if it pertained
to a matter over which the general government had
exclusive jurisdiction, as interstate commerce, than
it could successfully set aside the express will of con-
gress, as evidenced by the existing interstate commerce
act.   It is quite clear that the words "common law,"
used in the opinion, refer to the common law as enacted,
adopted, or recognized by the individual states.   In
*Smith v. Alabama,* 124 U. S. 465, 8 Sup. Ct. Rep. 564, it
is said:   "There is, however, one clear exception to the
statement that there is no national common law.   The
interpretation of the constitution of the United States
is necessarily influenced by the fact that its provisions
are framed in the language of the English common law,
and are to be read in the light of its history.   The code
of constitutional and statutory construction, which,
therefore, is gradually formed by the judgments of this
court, is the application of the constitution, and the
laws and treaties made in pursuance thereof, has for

its basis so much of the common law as may be implied
in the subject, and constitutes a common law resting on.
national authority." In the same case it is said: "A
determination in a given case of what that law is may
be different in a court of the United States from that
which prevails in the judicial tribunals of a particular
state. * * * This is illustrated by the case of *Rail-*
*road Co. v. Lockwood,* 17 Wall. 357, where the common
law prevailing in the state of New York in reference to·
the liability of common carriers for negligence received
a different interpretation from that placed upon it by
the judicial tribunals of the state; but the law, as·
applied, was none the less the law of that state." Now,
the common law above spoken of, which rests upon
national authority, is not that which existed at the time
of the adoption of the constitution; nor can it be, in the
light of the language used by the court, a common law
which is vitalized into life by the statutes or decisions
of the several states. There is, however, nothing in
the language used justifying the contention that such
a common law as the learned justice speaks of could
interfere with the constitutional power of congress to
regulate interstate commerce. Reference is also made
to the case of *Railway Co. v. Osborne,* 10 U. S. App. 430,
3 C. C. A. 347, 52 Fed. Rep. 912. In speaking of the
condition of affairs prior to the enactment of the inter-
state act, the court said: "It was the first effort of the
general government to regulate the great transporta-
tion business of the country. That business, though
of a *quasi* public nature, and therefore subject to gov-
ernmental regulation, had, as a matter of fact, been
carried on by private capital, through corporations.
The fact that it was of a *quasi* public nature always
prevented the owners of capital invested in it from
charging, like owners of other property, any price they
saw fit for its use. A reasonable compensation was all
that they could exact, and he who felt aggrieved by any

charge could invoke the aid of the courts to protect himself against it." Whatever construction may be placed upon this language is a matter of no moment, as the case itself did not involve any question of interstate transportation prior to the taking effect of the interstate commerce act. It is, therefore, not authority for plaintiff's contention. We do not see that the case of *Mississippi Mills v. Cohn*, 150 U. S. 202, 14 Sup. Ct. Rep. 75, sustains appellant's contention. That was a case wherein it was held that the equity jurisdiction of the federal courts is uniform throughout the country, and that such jurisdiction is not to be determined by any state rule or law statute, civil or common law. *Moore v. U. S.*, 91 U. S. 270, simply decides that as to the court of claims, in the absence of other provisions by congress, the rules of evidence as found in the common law should govern the action of the court. No interstate question was involved. No question of whether there was a national common law which conferred a right was in the case. To the same effect is *U. S. v. Clark*, 96 U. S. 37. It must be conceded that there have been many cases in which the United States supreme court has determined contracts to be against public policy. *Oscanyan v. Arms Co.*, 103 U. S. 261; *Marshall v. Railroad Co.*, 16 How. 314; *Tool Co. v. Norris*, 2 Wall. 45; *Trist v. Child*, 21 Wall. 441; *Hannauer v. Doane*, 12 Wall. 342; *Thomas v. City of Richmond*, Id. 349; *Woodstock Iron Co. v. Richmond & D. Extension Co.*, 129 U. S. 643, 9 Sup. Ct. Rep. 402.

We cannot take up and consider every case cited, but it may be profitable to speak of some other cases relied upon by appellants. Counsel rely upon the following language found in *Bucher v. Railroad Co.*, 125 U. S. 580, 8 Sup. Ct. Rep. 974: "There is no common law of the United States, and yet the main body of the rights of the people of this country rest upon, and are governed by, principles derived from

the common law of England, and established as the
laws of the different states." Here is a clear recogni-
tion of the fact that the only common law in this coun-
try is that established or recognized by the several
states. Further on in the same case it is said: "When,
therefore, in an ordinary trial in an action at law, we
speak of the common law, we refer to the law of the
state as it has been adopted by statute, or recognized by
the courts, as the foundation of legal rights." We are
referred to the case of *Cook v. Railway Co.,* 40 Iowa,
557 (46 N. W. Rep. 1080). That was a case in its
facts, like the one at bar, except the question made
by the demurrer in this case was not raised in that
case. We cannot, therefore, treat that case as deter-
mining the question of the existence of a national
common law. The case was based upon a com-
mon-law liability, it is true, but its applicability
to an interstate shipment as a rule of national law
was not involved. A multitude of cases from state
courts might be cited touching the common-law rule
applicable to common carriers. As, however, they do
not involve a consideration of the question of such liabil-
ity as applied to interstate shipments, they shed no
light upon the question under consideration, and we do
not discuss them. Counsel claims that the case of
*Fuller v. Railway Co.,* 31 Iowa, 208, 209, is decisive of
the question presented. That case was affirmed by the
United States supreme court in 17 Wall. 560. That
case involved the question as to the validity of a statute
of this state which required railroad companies to fix
rates, and post copies thereof at stations and depots.
In the course of its opinion the federal court said: "In
all other respects, there is no interference. No other
constraint is imposed. Except in these particulars,
the company may exercise all its faculties as it shall
deem proper. No discrimination is made between local

and interstate freights, and no attempt is made to con-
trol the rates that may be charged. If the require-
ments of the statute had in question were, as contended
by the counsel for the plaintiff in error, regulations of
commerce, the question would arise whether, regarded
in the light of the authorities referred to, and of reason
and principle, they are not regulations of such a char-
acter as to be valid until superseded by the permanent
action of congress." If the above stood as the judg-
ment of that court, without modification, there might
be reason for claiming that a state statute regulating
rates might be effective in the absence of national legis-
lation as to interstate shipments. But that question
seems to be finally set at rest, against appellant's con-
tention, in the case of *Wabash Ry. Co. v. People of Illi-
nois*, 118 U. S. 557, 7 Sup. Ct. Rep. 4, and other cases
referred to. Now, the case of *Hart v. Railway Co.*, 69
Iowa, 490 (29 N. W. Rep. 597), was one where it was
contended that the provision of statute providing
that no rule or regulation contained in any con-
tract or receipt of a common carrier should exempt
such carrier from any liability which would other-
wise exist, was invalid, as a regulation of com-
merce. It was held that the law was not open to
that objection. That decision was based upon the
so-called "Granger Cases," and others therein cited.
These cases are reviewed in the opinion in the *Wabash
Railway Case,* 118 U. S. 557, 7 Sup. Ct. Rep. 4, and it was
there held that "it is not, and never has been, the
deliberate opinion of a majority of this court that a
statute of a state which attempts to regulate the fares
and charges by railroad companies within its limits,
for a transportation which constitutes a part of com-
merce among the states, is a valid law." It is not to
be denied that there are expressions to be found in
some of the opinions of the supreme court of the United
States which apparently justify appellant's contention.

Thus, it has been said in some cases that the question of "what constitutes a question of carriage is not a question of local law, upon which the decisions of a state court must control. It is a matter of general law, upon which this court will exercise its own judgment." *Myrick v. Railway Co.*, 107 U. S. 109, 1 Sup. Ct. Rep. 425; *Robbins v. City of Chicago*, 2 Black. 418; *Brooklyn City & N. R. Co. v. National Bank of N. Y.*, 102 U. S. 14; *Hough v. Railroad Co.*, 100 U. S. 213. We incline to the opinion that in nearly all of the cases relied upon, the common law which is referred to in the decisions of the United States courts is that common law adopted by the several states, and that the federal courts in determining questions of a general character, of national importance, will not feel bound to follow the construction of the common law which may have been adopted by the courts of the several states, but will give it their own construction. In such cases, however, they are not administering a national common law, but only that adopted or recognized by the several states. In this view, it may well be said that "the courts of the United States administer the common law in many cases." Cooley, Const. Lim. page 30. So they do, but it is the common law as existing in the several states. And, in the same view, it is true that "legislative and constitutional provisions are common in the United States, prohibiting discriminations, but are usually regarded as simply declaratory of the common law." *Southern Express Co. v. St. Louis, I. M. & S. R. Co.*, 3 Am. & Eng. R. Cas. 603, note, 10 Fed. Rep. 869. It is insisted by appellant that the interstate commerce act itself is a recognition by congress of the fact that prior to its enactment there existed common-law rights and liabilities pertaining to interstate commerce, and that by the provisions of said act these rights are saved to suitors. The section relied upon is section 22 of the

act, and it reads as follows: "Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition thereto." By its express terms, this provision relates to remedies. It is not even intimated that there exist rights conferred by a national common law. Again, the provision is made applicable to statutes as well as remedies at common law. No distinction is made between them, as to their force and effect when either may be applied to interstate commerce. Now, this provision of that statute, that it shall not abridge or alter remedies existing by statute, must refer to such statutes as do not attempt to regulate interstate commerce in violation of the constitutional provision; and, in like manner, the provision that it shall not alter or abridge remedies existing by common law applies only to such common-law rules as do not interfere with such commerce; or the provision may refer to state statutes, or common law adopted by the several states, regulating commerce only within the state.

Counsel contend that the common law of the several states is "one entire body or system of law, and its rules and principles are the same," no matter in what state they may be administered. If it be true that the rules and principles of the common law are the same in all of the states,—a proposition which we think is hardly true,—still it is certain that the same common law is differently construed in different state jurisdictions. Thus, in one state it may be held that the common law did not permit discriminations, and, in another, that it did. Hence it is that we find the federal courts, in certain cases, some of which we have cited, holding, in determining what the common law, as enacted, adopted, or recognized by the state, is, they will not be bound by the interpretation

given thereto by the state courts. Again, it is undeniable that in any state in which the common law may be in force the legislature may alter it, or set it aside. So, if appellant's contention is correct, and the common law applicable to each state should control, as to regulating charges for interstate commerce, we might have one common-law rule affecting such shipments in Iowa, and a different rule in Illinois, or the same rule differently interpreted. The result would be that an act of the carrier of an interstate shipment through Iowa and Illinois might be legal in one state, and illegal in the other. It is manifest that such a state of affairs cannot exist. So, too, in this connection, it may be said that inasmuch as the constitutional right conferred upon congress to regulate interstate commerce is exclusive,—and, as we have shown, it is held that. in the absence of legislation by congress upon the subject it was manifest that congress intended to leave such commerce free and unfettered by any positive regulations. Such intention would be contravened as much by any common-law rules operating as regulations of such commerce as by an express statute of the state having a like effect. In other words, the power to regulate interstate commerce has, by the federal constitution, been withdrawn, as a subject of legislation, from the several states, and the constitutional provision seems to us to be equally effective as against such regulations based upon any common-law rule in force in a state. This view, we think, is clearly supported by the cases heretofore cited.

Reliance is placed upon article 7 of amendments to the federal constitution, which provides that: "In suits at common law where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved: and no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the

common law." That article relates only to the federal
courts. It establishes the right, so far as the method
of trial is concerned, and, in defining such right, speaks
of suits at common law as distinguished from those in
equity. That, it seems to us, is its only effect.

It is said, if, prior to the passage of the interstate
commerce act, the rules of the common law did not
govern as to interstate shipments, there was in fact no
law affording redress in such a case as this, and that it
is not to be supposed that such is the case. It
is to be remarked that until recent years the
idea prevailed that rights such as are claimed in
the case at bar might be given by the statutes of the
several states until such time as congress should chose
to act. That that idea was incorrect is fully shown in
the case of *Wabash, etc., Ry. Co. v. People of Illinois*,.
118 U. S. 557, 7 Sup. Ct. Rep. 4,—heretofore referred to.
Within a few months after this decision was made, con-
gress passed the interstate commerce act. It may be
conceded that the view we adopt would work a hard-
ship as to cases which arose before the passage of the
interstate commerce act; but, be that as it may, the
want of a proper law giving a right of recovery in cases
like this cannot affect the proper construction of the
provisions of the federal constitution.

We have read with care the opinion in the case
of *Swift v. Railroad Co.*, 58 Fed. Rep. 858, and in 64 Fed.
Rep. 59, decided by the United States circuit court for
the Northern district of Illinois, wherein the precise
question involved in this case is decided, and it is held
that there is no national common law; also the opinion
in the case of *Murray v. Railway Co.*, 62 Fed. Rep. 24,
decided by the circuit court of the United States in the
Northern district of Iowa, wherein a contrary conclu-
sion is reached. The federal supreme court, which
must finally settle this conflict in opinion, has, as yet,
not passed upon the question involved in this case. It

has, however, as we think we have shown, repeatedly declared that there was no common law of the United States. We think the language used in the opinions of that court is absolutely inconsistent with the theory contended for,—that the United States, as a nation, has recognized the existence of a national common law applicable to a case like that at bar.

There are other reasons which impress us with the correctness of the result reached by the lower court, but we must forego a discussion of them. Our conclusion is that there is no national common law; that the state cannot regulate interstate commerce, in the absence of congressional action, either by express statutory enactment, or through the medium of the common law which may be recognized as in force in such state; that the right claimed in this case would amount to a regulation of commerce between the states, as defined by the federal supreme court, and hence is in contravention of the federal constitution. The demurrer was properly overruled.—*Affirmed.*